


U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

**United States Bankruptcy Judge**

**Signed June 07, 2011**

---

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 09-38643-bjh-7** |
| **CHRISTOPHER ADAM ARNETTE,** | § | **(Chapter 7)** |
| | § | |
| Debtor. | § | |

---

| | | |
|---|---|---|
| **THE WARD FAMILY FOUNDATION,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 10-03062[1]** |
| | § | |
| **CHRISTOPHER ADAM ARNETTE,** | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION

The Court tried this adversary proceeding (the "Adversary") on April 13 through 15, and April 20, 2011. The last of the post-trial briefs was submitted on April 28, 2011, following which the Court took the matter under advisement.

---

[1] Consolidated with adversary proceeding number 10-03048.

**MEMORANDUM OPINION**                                          **PAGE 1**

Plaintiff, The Ward Family Foundation (the "Foundation"), is a non-profit corporation that uses the income earned on its investments to support a number of charitable causes. Defendant, Christopher Adam Arnette ("Arnette"), is an individual resident of Dallas, Texas, who filed for relief under chapter 7 of the Bankruptcy Code on December 22, 2009. In the Adversary, Plaintiff seeks to (i) liquidate its claim against Arnette, (ii) have its claim determined to be nondischargeable in Arnette's bankruptcy case, and/or (iii) have Arnette's discharge denied.

The Court has jurisdiction over the parties and the issues pled in the Adversary pursuant to 28 U.S.C. §§ 1334 and 157(b). The Court may enter a final judgment and a monetary judgment in this matter. *Morrison v. W. Builders of Amarillo (In re Morrison),* 555 F.3d 473, 479-80 (5th Cir. 2009). This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    The "Investment Opportunity" As Presented to the Foundation

Arnette met John Winslow ("Winslow"), an employee of the Foundation, at church in the fall of 2006. As they became acquainted, Winslow learned that Arnette was in the real estate business. Specifically, Arnette had two companies, HomeQwest HomeBuyers, Inc. a/k/a HomeBuyers of Texas, Inc. ("HomeQwest") and Autopilot Property, LLC ("Autopilot"),[2] through which he, in general terms, purchased residential real estate, rehabilitated the properties, and then either sold or leased them to a third party with an option to own. Winslow, a financial advisor and the Foundation's Chief Operating Officer, was always looking for new investments

---

[2] At all relevant times, Arnette was the President, sole stockholder, and sole decision maker of HomeQwest and was the sole member and sole decision maker of Autopilot. Autopilot did not have a bank account. It used HomeQwest's bank accounts.

**MEMORANDUM OPINION**                                                                                    **PAGE 2**

for the Foundation and the Ward family generally.  As a result, Winslow suggested to Arnette that they have lunch to discuss potential business opportunities.

The lunch occurred on or about October 25, 2006.  There, Arnette talked about his track record of buying and selling houses, saying that he (i) had completed over $10 million in residential transactions, (ii) had completed 30-40 deals in the previous year, and (iii) was "on track" to complete more than 50 transactions in 2006.  The premise of Arnette's business as explained to Winslow was that Arnette, acting through one of his companies, would buy a house, fix it up to be "the nicest in the neighborhood," and then resell it for a profit.  Arnette told Winslow that he had existing investors but that he needed to expand his group of private investors.  Arnette said he preferred to use private investors because banks take too long to approve and close loans, and most of his deals involved highly motivated sellers who needed to sell their homes quickly.[3]

On October 27, 2006, Arnette followed up by sending Winslow an email to which he attached "an informational piece for you to look over.  It is a pdf that explains our basic process of how the business is done (in general).  This should give you a clear understanding of the investment opportunity."  Plaintiff's Exhibit 1.[4]  Winslow brought his boss William Ward ("Ward"), the patriarch of the Ward family, into the discussions because he thought an investment with Arnette might be a fit for the Ward family or the Foundation.

The Foundation ultimately decided to invest with Arnette, through his companies, HomeQwest and Autopilot.  Though the documentation supporting the Foundation's investments is not extensive, in general terms, the Foundation agreed to lend either HomeQwest or Autopilot

---

[3] These oral representations were repeated in what the parties alternatively referred to as a "solicitation memorandum" or a "sales pitch."  *See*  Plaintiff's Exhibit 1.
[4] Hereinafter, the Plaintiff's trial exhibits will be referred to as P followed by the number of the exhibit.  So, Plaintiff's Exhibit 1 will be referred to as P-1.

enough funds to purchase a particular piece of real property and to repair it for resale (based upon an estimate of repair costs provided by Arnette).  The Foundation would be repaid on the earlier of the sale or refinancing of the rehabbed property, or the one-year anniversary of the property's acquisition.  With two exceptions, the parties agreed that the Foundation would earn eighteen percent (18%) interest on the principal amounts loaned.  If a property sold for more than the original principal amount of the loan (plus accrued interest), the surplus would belong to HomeQwest or Autopilot as its profit on the transaction.[5]  The Foundation understood that the funds it was advancing would be used solely for financing the costs to acquire each property and covering the estimated out-of-pocket repair costs for each property.

Each time Arnette identified a property for a possible Foundation investment, he would send Winslow a one-page document called a "proforma."  *See, e.g.*, P-11.  Each proforma identified the specific property by address and contained a picture of the home on the property.  Each proforma also contained certain financial information, including the purchase price of the property, the estimated cost to repair the property, and the estimated repaired market value of the property.   The estimated repaired market value of the property was usually supported by a "CMA," or comparative market analysis, prepared by Arnette (generally, a ½-page document).  *See, e.g.*, P-12.

If Winslow liked what he saw on the 1½ pages submitted—*i.e.*, the proforma and the CMA—and from his conversations with Arnette, he would recommend to Ward that the Foundation loan HomeQwest or Autopilot the funds necessary to purchase and repair the

---

[5] The two exceptions are the properties located at 4600 Alexandra, Colleyville, Tx and 6821 Merrilee, Dallas Tx. Those two properties were more expensive properties with more extensive repairs required.  According to Arnette, less profit existed on larger deals and so he proposed that the Foundation agree to an alternate arrangement, pursuant to which the Foundation would loan the funds necessary to purchase and repair the properties (evidenced by a note and deed of trust to secure the note) and the Foundation and HomeQwest would split the profits realized on a resale of the properties instead of the Foundation receiving interest on the principal amount of its loan.

property in question.   Ward made the ultimate decision to fund each loan.   The loans were documented by a note and deed of trust.  *See, e.g.*, P-14 & P-15.  But no formal loan agreement detailed what the loan proceeds could or could not be used for, or any specific requirements for the loan proceeds – *i.e.*, separate bank accounts per property or the like.

Initially, the Foundation agreed to loan HomeQwest the funds to purchase and repair the following four properties (the "Initial Properties"):

- 3214 Millmar, Dallas, Texas 75228
- 4713 Chilton, Dallas, Texas 75227
- 914 Annabelle, Dallas, Texas 75217
- 3911 Emerald, Mesquite, Texas  75150.

The "deal" worked as it was supposed to regarding the Initial Properties.   Each property was purchased and either sold or refinanced timely, allowing the Foundation to be repaid for its loans as required by the promissory notes secured by the Initial Properties.

From   April   2007   through   January   2008,   Arnette   solicited   investments   from   the Foundation for eight more properties (collectively, the "Subsequent Properties," or individually, a "Subsequent Property") on behalf of HomeQwest and Autopilot as follows:

- 3773 Matador Drive, Dallas, Texas 75220 funded 04/05/2007 – HomeQwest (the "Matador Property")
- 4101 Keystone Street, Garland, Texas 75041 funded 05/01/2007 – HomeQwest (the "Keystone Property")
- 4600 Alexandra, Colleyville, Texas 76034 funded 06/08/2007 – HomeQwest (the "Alexandra Property")
- 1334 Valley View Street, Mesquite, Texas 75149 funded 06/29/2007 – HomeQwest (the "Valley View Property")
- 500 N. Delaware, Irving, Texas 75061 funded 08/23/2007 – Autopilot (the "Delaware Property")
- 6821 Merrilee, Dallas, Texas 75214 funded 09/05/2007 – HomeQwest (the "Merrilee Property")
- 336 College Street, Lewisville, Texas 75057 funded 01/09/2008 – HomeQwest (the "College Property")
- 2113 Avis Street, Mesquite, Texas 75149 funded 01/09/2008– HomeQwest (the "Avis Property").

**MEMORANDUM OPINION**                                                           **PAGE 5**

As with the Initial Properties, Arnette submitted a proforma for each Subsequent Property to the Foundation before the Foundation loaned additional monies to either HomeQwest or Autopilot to purchase and repair each Subsequent Property.  In addition, with few exceptions, before the additional monies were loaned, Arnette represented (through the proformas) an estimated after-repaired market value of the Subsequent Properties and, in many cases, presented the Foundation with a CMA to substantiate his estimate of that after-repaired market value.  As with the Initial Properties, the Foundation received a note for the monies loaned with respect to each Subsequent Property and was granted a first lien (by way of deed of trust) to secure repayment of the note.

Overall, the Foundation loaned HomeQwest and Autopilot a total of $1,743,400 for the purchase and repair of the Subsequent Properties.

**B.     The Investment Opportunity Sours**

In mid-December 2008, Autopilot and the Foundation, among others, were sued by various Dallas taxing authorities in connection with unpaid property taxes on the Delaware Property.  P-143, pp. 58-64.  Winslow then confronted Arnette and asked why the taxes had not been paid on the Delaware Property and whether taxes had been paid on the other Subsequent Properties.  To his dismay, Winslow ultimately learned that taxes were due and unpaid on all of the Subsequent Properties.  Moreover, Winslow ultimately learned that instead of using the Foundation's loan proceeds solely for the purchase and repair of the Subsequent Properties, Arnette had been using the Foundation's loan proceeds to, among other things: (i) repay earlier investors, (ii) pay for repairs on non-Foundation properties, the acquisition of which had been financed by other investors (who had also provided funds to repair their properties), (iii) pay for general business expenses of HomeQwest, including advances and distributions to Arnette to

support his family and lifestyle, and (iv) pay for certain of Arnette's personal expenses directly (although those amounts were ultimately recorded on HomeQwest's books as either advances or distributions to Arnette). In short, the Foundation learned that some of its loan proceeds were not spent on the repair of the Subsequent Properties, and there were no funds remaining in HomeQwest (or otherwise) from which to complete the necessary repairs.

On December 24, 2008, Winslow sent Arnette an email asking for detailed information about the status of each of the Subsequent Properties. Winslow wanted to know the current condition of the properties, what repairs remained to be done, the status of taxes or other liens on the properties, maintenance costs, and what "its [sic] going to take to get these properties moved." P-104.

In their subsequent meetings, and according to the testimony of Winslow and Ward, Arnette "confessed" to, among other things: (i) misusing the proceeds from the Foundation's loans—*i.e.*, not using them to make the repairs, (ii) having personal and business financial problems, and (iii) not being able to repay the notes, which were secured by liens on the Subsequent Properties. While Arnette denies having "confessed" to anything, he agrees that (i) the loan proceeds were not used to repair all of the Subsequent Properties, (ii) there were no funds remaining in HomeQwest (or otherwise) from which to repair the Subsequent Properties, and (iii) the notes were in default and could not be repaid.

As of January 2009, all of the notes evidencing the Foundation's loans had matured. However, HomeQwest had failed to sell any of the Subsequent Properties and had failed to repay any amounts due under those notes.

On February 2, 2009, the Foundation, acting through a special purpose vehicle it created for this purpose—The Ward Family Foundation Holdings, LLC—accepted deeds in lieu of

foreclosure on each of the Subsequent Properties.  P-111–P-118.  The deeds recite that the consideration for them being executed in favor of the Foundation's affiliate was a partial release of the principal amount due on the underlying notes.

After its affiliate became the owner of the Subsequent Properties, the Foundation expended considerable time and incurred considerable expense in (i) insuring them, (ii) paying the outstanding tax bills on them, (iii) investigating and paying off other liens on them, (iv) completing repairs on them, (v) maintaining them, and (vi) disposing of them.[6]  The specific amounts incurred by the Foundation were testified to by Susan Kinser ("Kinser"), the Foundation's Chief Financial Officer.  Kinser's testimony is summarized on P-9, a chart that itemizes these amounts.  Based upon the evidence presented, the Court is satisfied that the amounts shown on P-9 are correctly calculated with the exception of the interest calculation on the Alexandra Property and the Merrilee Property.[7]  Kinser calculated interest at 18% on the Foundation's loans for the purchase and repair of those properties from the inception of the loans.  However, those two properties were the profit split properties and the Foundation was not entitled to receive interest until the notes evidencing those two loans went into default.  Accordingly, Kinser's calculation is overstated by a year's worth of interest on each loan.[8]

On May 12, 2009, the Foundation sued Arnette, HomeQwest, and Autopilot in state district court in Dallas County.  In its Original Petition, the Foundation stated claims for (i) fraud, (ii) civil theft, (iii) suit on a note, (iv) breach of contract, (v) conversion, (vi) unjust enrichment, (vii) promissory estoppel, and (viii) money had and received.  The Foundation

---

[6] The Keystone Property had not been sold by the time of trial, although it is on the market.
[7] The Court's finding does not address what damages the Foundation is legally entitled to receive.  Rather, all the Court is finding at this time is that the amounts shown were correctly calculated, with the exception noted.
[8] During closing arguments, counsel for the Foundation agreed and submitted an amended calculation to the Court and Arnette's counsel post-trial that reduced P-9 accordingly.

**MEMORANDUM OPINION**                                                                 **PAGE 8**

sought, among other things, the imposition of a constructive trust on the defendants' funds and to recover its actual damages, exemplary damages, and reasonable attorneys' fees and costs.

As noted previously, Arnette filed his chapter 7 bankruptcy case in this Court on December 22, 2009.  The Foundation then removed its state court action to this Court and filed an objection to Arnette either discharging its debt or receiving a discharge generally.  The removed state court action and the discharge action were consolidated into the Adversary.

At some point in this process, the Foundation discovered that Arnette had had a falling out with at least one prior investor, Kirtland Realty Group ("Kirtland").  The Foundation surmises, and asks this Court to infer, that this falling out is why, at least in part, Arnette was anxious to have the Foundation invest with him.  It is true that Kirtland confronted Arnette regarding its "missing money" in early October 2006—very shortly before Arnette and the Foundation began discussing the Foundation's possible investment with Arnette.  Moreover, in December 2006, the month the Foundation began investing with Arnette, Kirtland demanded that Arnette personally guarantee HomeQwest's obligations to it, which Arnette did.  From this, the Foundation concludes that it "was targeted" by Arnette, in order to allow "him to keep his Ponzi scheme alive by using the Foundation's Funds to cover Arnette's debts to Kirtland and others.  As with any Ponzi scheme, Arnette's representations to Kirtland luring it in to the 'investment opportunity' were nearly identical to those made to the Foundation."  Plaintiff's Proposed Findings of Fact and Conclusions of Law, Docket No. 64, ("Plaintiff's Findings and Conclusions) p. 5, finding 11.

### C.    The Accountant's Study of HomeQwest's Financials

The Foundation hired a forensic accountant, Stephen Thomas ("Thomas"), to analyze HomeQwest's financial books and records.  Based upon his analysis, Thomas concluded that

only $204,386.91 (at most) of the $420,900.00 the Foundation loaned for repair costs in connection with the Subsequent Properties was used for that purpose. P-153, Tab 7. According to Thomas, this number is a generous estimate because it assumes that HomeQwest's records are accurate and that all repairs reflected in the books were in fact made. Thus, Thomas determined that at least $216,513.09 ($420,900.00 (*Id.*, Tab 5) minus $204,386.91 (*Id.*, Tab 7)) of the funds loaned by the Foundation for repairs to the Subsequent Properties was not used for that purpose.

Thomas' analysis also revealed that HomeQwest received an additional $18,519.00 at the closing of its purchase of the Subsequent Properties. *Id.*, Tab 6. These amounts were, in large part, the seller's pro rata portion of ad valorem taxes that HomeQwest received at closing but then failed to pay to the taxing authorities when the taxes were due. As previously found, the Foundation was subsequently forced to pay these amounts to the taxing authorities to obtain the release of their tax liens against the Subsequent Properties. Thus, according to the Foundation, at least $235,082.00 ($216,513.09 + $18,519.00) was not used by HomeQwest for its intended purposes.

Based upon HomeQwest's books and records, the diversion of funds for non-repair purposes did not begin until June 2007. For example, HomeQwest purchased the Matador Property with Foundation funds on April 5, 2007. P-5. Of the Foundation's $180,000 loan, $32,000 was to be used for repairs to the property and $148,000 was to be used for the purchase of the property. *Id.* According to Thomas' analysis of HomeQwest's books and records, HomeQwest spent $41,258.66 to repair the Matador Property, well more than the original repair estimate. P-153, Tab 7. Moreover, according to Kinser, the Foundation incurred an additional $14,571.33 of costs to repair and maintain the Matador Property so that it could be sold by the Foundation's affiliate for $189,500.00, a net loss to the Foundation of $101,060.96. P-9. The

same is true for the Keystone Property and the Alexandra Property. In both instances, HomeQwest's books and records reflect that it spent more on repairs for the property than the Foundation had loaned it for that purpose. P-153, Tab 7. And, at least with respect to the Alexandra Property, the Foundation incurred substantial additional costs to repair and maintain it so that it could be sold by the Foundation's affiliate for $562,500.00, a net loss to the Foundation of $405,553.40. P-9.

Beginning with the purchase of the Valley View Property in late June 2007 and thereafter, HomeQwest's books and records reflect that Autopilot and it failed to spend the amounts loaned by the Foundation for repairs for that purpose. Repairs to the Valley View Property, the Delaware Property, the Merrilee Property, the College Property, and the Avis Property were not made as represented. P-153, Tab 7.

**D.    Facts Supporting the Foundation's Alter Ego Claim**

At trial, the Foundation proved the following facts by a preponderance of the credible evidence:

1.  Arnette, HomeQwest, and Autopilot had blended finances, accounts or assets;

2.  HomeQwest was insolvent—*i.e.*, its total liabilities exceeded its total assets—by April 5, 2007 (the date the Foundation advanced funds for the purchase and repair of the Matador Property); P-237;

3.  Arnette was the sole owner/member and officer of HomeQwest and Autopilot and exclusively controlled the day-to-day operations of HomeQwest and Autopilot;

4.  HomeQwest and Autopilot shared the same office and had common employees and/or independent contractors;

5.  Arnette had sole control over HomeQwest's bank accounts, including the funds lent by the Foundation for the repair of the Subsequent Properties;

6.  Autopilot had no bank accounts and instead used the accounts of HomeQwest;

7.  On occasion, Arnette used his personal credit cards for HomeQwest purchases;

8.  When addressing the actions of HomeQwest and Autopilot, Arnette referred to the actions as his;

9.  Arnette commingled funds of HomeQwest and Autopilot with his personal funds without proper documentation, including endorsing checks made payable to HomeQwest to himself and depositing the same in his personal bank account;

10.  Arnette was not paid a regular salary and did not have any sort of agreement with HomeQwest and Autopilot regarding when and/or how he was to be compensated for his services as an officer or employee. Rather, Arnette simply took money from HomeQwest—either through a loan or through distributions—to fund his lifestyle; and

11.  On occasion, Arnette used HomeQwest and Autopilot for personal purposes without properly documenting same.

## II.  LEGAL ANALYSIS

As noted previously, the Foundation seeks a money judgment against Arnette for fraud, breach of contract, suit on a note, unjust enrichment, promissory estoppel, money had and received, and to recover the reasonable attorneys' fees and costs it has incurred in obtaining that judgment.[9]  In addition, the Foundation seeks an award of exemplary damages where applicable. Finally, the Foundation seeks a determination that the amounts owed to it, together with any

---

[9] During closing arguments, counsel for the Foundation announced that the Foundation was no longer asserting its claims for civil theft and conversion.

other damages awarded to it, are nondischargeable under section 523(a)(2)(A), (a)(4), and/or (a)(6) of the Bankruptcy Code and that Arnette is not entitled to a discharge under section 727(a)(5) of the Bankruptcy Code.[10]

From the Court's perspective, the Court must first determine if the Foundation is entitled to a judgment against its borrowers, HomeQwest and Autopilot. If the Court concludes that Arnette's companies can be held liable, the Court will next consider whether Arnette can also be held liable for the Foundation's damages. Then, if the Court concludes that Arnette can be held liable for the Foundation's damages, the Court will consider the nondischargeability and objection to discharge issues.

### A. Is the Foundation Entitled to a Judgment Against HomeQwest and/or Autopilot?

#### (1) The Fraud Claim

For the Court to find that HomeQwest and Autopilot defrauded the Foundation, the Foundation must show: (1) HomeQwest and Autopilot made a material misrepresentation to the Foundation, (2) with knowledge that the representation was false or with reckless disregard of the truth of the representation, (3) intending that the Foundation rely on the representation, (4) that the Foundation did so rely, and (5) the Foundation was injured as a result. *Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001); *McEwin v. Allstate Tex. Lloyds*, 118 S.W.3d 811, 815-16 (Tex. App. 2003) ("The gist of fraud is successfully using cunning, deception or artifice to cheat another to the other's injury").

---

[10] Similarly, during his argument in opposition to Arnette's motion for directed verdict, counsel for the Foundation conceded that the Foundation was not seeking to have its debt declared nondischargeable under section 523(a)(4) for fraud in a fiduciary capacity or larceny; rather the Foundation was proceeding under this section only for embezzlement. Moreover, counsel conceded that the Foundation could not proceed on its claim under section 727(a)(2).

The Foundation alleges that HomeQwest and Autopilot made the following material misrepresentations:

1. The loan amount on any Subsequent Property would not exceed 75% loan-to-value, and in some cases, would be less;

2. The after-repaired value of the Subsequent Properties would be as represented in the proformas and other solicitation materials;

3. The costs of repairing the Subsequent Properties would be as represented in the proformas;

4. The Subsequent Properties would be fixed-up to be the "nicest in the neighborhood;"

5. The profits and expenses for each Subsequent Property would be tracked separately;

6. HomeQwest and Autopilot would maintain separate bank accounts for each Subsequent Property;

7. The condition of the Subsequent Properties when purchased would be as represented in the proformas and solicitation materials;

8. All property taxes would be paid on the Subsequent Properties when due;

9. Insurance would be maintained on the Subsequent Properties and the Foundation would be designated as the loss payee on the insurance policy;

10. The Subsequent Properties would be maintained;

11. The purchase price of the Subsequent Properties would be as represented in the proformas;

12. Arnette, through his companies, had completed over $10,000,000 in residential transactions;

13. Arnette, through his companies, had purchased over forty properties in 2005, and was on track to acquire fifty-plus properties in 2006;

14. There would be no commissions or "sales loads" taken from the funds advanced as represented in the solicitation materials; and

**MEMORANDUM OPINION**                                                                      **PAGE 14**

15. The invested funds would be used exclusively to purchase and repair particular Subsequent Properties, as represented in the solicitation materials.

The Foundation also alleges that Arnette failed to disclose Kirtland's accusations of theft and misuse of invested funds just days before the Foundation began discussing a possible investment with Arnette, and that this omission was material.[11]

As a preliminary matter, Arnette argues that any representations he made in what Winslow called a solicitation memorandum—*i.e.*, P-1—in October 2006, cannot apply to the Subsequent Property transactions because Arnette did not restate those representations prior to each transaction.  The Court disagrees.  The evidence establishes that Arnette intended that the Foundation rely upon the representations in P-1 in connection with every transaction it entered into with him.  That document clearly contemplates multiple transactions by investors.  It described "the basic process of how the business is done," and included a PowerPoint presentation "outlining how our program works."  The PowerPoint presentation described a "cycle, with private investor funds *repeating the same successful procedure, over & over again*." (emphasis added).  The Court will therefore analyze each representation in P-1 as if it was made regarding each of the Subsequent Property transactions.

### a.  Representations 1 Through 4 Are Not Actionable Because They Are Opinions, Not Misrepresentations

A misrepresentation generally must be a false statement of fact or a promise of future performance made with the intent not to perform.  *Trenholm v. Ratcliff*, 646 S.W.2d 927, 930 (Tex. 1983); *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434–35 (Tex. 1986); *Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex. 1990).  "Pure expressions of opinion"—particularly opinions about monetary value, future value of property or prospects of

---

[11] The Foundation also argued that Arnette failed to disclose that Arnette thought he could use the Foundation's funds for purposes other than purchasing and repairing the Subsequent Properties.  But the Court finds this alleged omission to be simply the inverse of representation 15, and so does not warrant separate analysis.

gain—are not actionable in fraud, with two exceptions. *In re Westcap Enterprises*, 230 F.3d 717, 726 (5th Cir. 2000) (quoting *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995)); *Ryan v. Collins*, 496 S.W.2d 205, 210 (Tex. Civ. App. 1973) (fraud cause of action requires a misrepresentation which "must concern a material fact as distinguished from a mere matter of opinion, judgment, probability or expectation"). The exceptions are for opinions based on a false statement of fact, and opinions that are false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. *Trenholm*, 646 S.W.2d at 930-31; *Matis v. Golden*, 228 S.W.3d 301, 307 (Tex. App. 2007) (an action for fraud can be based on an opinion where a speaker purports to have special knowledge of the facts, or does have superior knowledge of the facts, as when the facts underlying the opinion are not equally available to both parties). "Whether a statement is an actionable statement of 'fact' or merely an innocuous statement of 'opinion' often depends on the circumstances in which a statement is made." *Transport*, 898 S.W.2d at 276. Factors to consider include the specificity of the statement, the parties' relative levels of knowledge, and whether the statement relates to the present or future. *Id*.

Here, based on the evidence presented, the Court finds that the Foundation's alleged misrepresentations 1 through 4 are opinions, not misrepresentations. The first three alleged misrepresentations involve the accuracy of the loan-to-value ratios, the after-repair market values, and the estimated repair costs. While Arnette made statements about these items in the proformas for each of the Subsequent Properties, the proformas themselves note that the after-repaired market values were derived from the CMAs. In turn, the CMAs were used to *estimate* a Subsequent Property's likely future value, not guarantee it. Further, the proformas themselves make clear that the stated loan-to-value ratio was based upon two estimates: the after-repaired

market value and the estimated repairs cost. If either of those estimates proved to be incorrect, the loan-to-value ratio would also be incorrect. The Foundation reviewed the proformas for each Subsequent Property before making the loans, so it knew of the assumptions on which these statements of opinion were based. Alleged misrepresentation 4, in which Arnette claimed the Subsequent Properties would be fixed up to be "the nicest in the neighborhood," is far too vague and subjective to be considered a statement of fact.

Thus, these four alleged misrepresentations are opinions, and to be actionable in fraud they must either be based on a false statement of fact or be made by Arnette after he claimed or implied that he had special knowledge of the subject matter of the opinions. *Trenholm*, 646 S.W.2d at 930. There is no credible evidence of either here.

For example, the statements concerning the after-repaired value, the loan-to-value ratio, and the estimated costs of repair could serve as the basis for fraud if Arnette knew they were erroneous—*i.e.*, if Arnette had skewed the CMAs by only selecting the highest-priced homes in the area. But the evidence here does not reveal Arnette to be so cunning. Rather, the evidence shows that Arnette provided the Foundation with what he believed to be accurate information regarding the CMAs, the after-repair values, and the estimated repair costs. The Foundation had the opportunity to review all of this information and, if it had concerns, could have either asked Arnette for more information or conducted its own due diligence. The Foundation elected to do neither. On this record, the Court finds that these three alleged misrepresentations are pure expressions of Arnette's honest opinion and so are not actionable. *See Stroud v. Meister*, No. Civ.A.3:97-CV-0860-L, 2001 WL 282764, at *8 (N.D. Tex. March 16, 2001) (representations are not actionable in fraud where "there is nothing to indicate the statement was other than the expression of an honest opinion").

**MEMORANDUM OPINION**                                                                 **PAGE 17**

Nor is alleged misrepresentation 4 actionable—*i.e.*, that Arnette would repair the Subsequent Properties to be "the nicest in the neighborhood." Which house is the "nicest in the neighborhood" is a matter of personal taste and myriad other factors beyond Arnette's control.

### b. Representations 5 Through 7 Are Not Actionable Because the Foundation Did Not Prove That They Are Material Misrepresentations

The Court finds that the Foundation failed to prove that representations 5, 6, and 7 are material misrepresentations. In representation 5, the Foundation contends that Arnette promised that the profits and expenses for each Subsequent Property would be tracked separately. While the books and records of HomeQwest and Autopilot are less than perfectly clear, one can determine the expenses for each property, and the "profit" per property can be calculated based upon when the properties were sold or refinanced. Thus, the Court finds that Arnette performed substantially as he said he would in representation 5.

In representation 6, the Foundation claims that Arnette promised that HomeQwest and Autopilot would maintain separate bank accounts for each property. Winslow testified accordingly. However, there is no documentary evidence of this alleged representation and Arnette disputes that he ever promised to maintain separate bank accounts for each property. Given the conflicting testimony and the lack of documentary evidence supporting Winslow's testimony,[12] the Court declines to find that Arnette made representation 6.

In representation 7, the Foundation contends that Arnette falsely promised that the Subsequent Properties were in the condition shown in the proformas. But there is no credible

---

[12] The Court has concerns about the accuracy of at least some of Winslow's testimony. He was openly hostile on the witness stand and remains visibly angry over what happened here. He was clearly embarrassed to have been "taken in" by Arnette and, while apparently not fired over his handling of this investment, is no longer employed by the Foundation, which job was clearly important to him and of which he was immensely proud. Accordingly, the Court has concerns that his testimony overstates what happened here in order to paint his conduct in the most favorable light.

**MEMORANDUM OPINION**                                                                 **PAGE 18**

evidence to suggest that the Subsequent Properties were not in that condition. Thus, the Court finds that representation 7 was not false and so cannot give rise to a claim for fraud. *See Trenholm*, 646 S.W.2d at 930 (for a representation of fact to be a misrepresentation it must be false).

For these reasons representations 5, 6, and 7 are not misrepresentations and so cannot support the Foundation's fraud claim.

### c. Representations 8 Through 10 Are Not Actionable Because the Foundation Did Not Prove that Arnette Made Them Intending Not to Perform

Representations 8, 9, and 10 are promises of future performance that Arnette made to the Foundation on behalf of HomeQwest and Autopilot. Arnette's promises of future performance can be material misrepresentations for fraud purposes if he made them with the intent not to perform. *Spoljaric*, 708 S.W.2d at 434. In other words, the Foundation must show that Arnette made those promises never intending to perform them. "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 1033-34 (5th Cir. 2010). "Failure to perform, standing alone, is not evidence of the promisor's intent not to perform when the promise was made[;] [h]owever that fact is a circumstance to be considered with other facts to establish intent." *Spoljaric*, 708 S.W.2d at 434-35. "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Id.* "Since intent to defraud is not susceptible to direct proof, it invariably must be proven by circumstantial evidence. Slight circumstantial evidence of fraud, when considered with the breach of promise to perform, is sufficient to support a finding of fraudulent intent." *Id.*

In his closing argument, Arnette's counsel argued that there was evidence in the record demonstrating that when Arnette made representations 8, 9, and 10, Arnette had every intention of performing as promised. Arnette's counsel pointed to three areas of evidence to support his argument: (i) the "deals" worked as promised with respect to the Initial Properties; (ii) Arnette actually spent more money to repair two of the Subsequent Properties than he had estimated; and (iii) Arnette committed his own funds, as well as funds he borrowed from his father, to try to keep HomeQwest and Autopilot afloat. There is evidence in the record supporting these arguments.

The Court has struggled with these alleged material misrepresentations. Arnette certainly should have known when he began to close the Subsequent Property transactions with the Foundation in April 2007 that his financial condition was precarious and that he might have trouble paying taxes, insurance, and maintenance costs in connection with the Subsequent Properties. His companies were insolvent on a balance sheet basis, and his personal savings was substantially depleted. However, like many debtors, it is equally likely that Arnette truly believed he could turn things around. If not, why would he borrow monies from his father fairly late in the process, commit his own funds, and spend more, not less, on repairing certain of the properties than expected?

It was the Foundation's burden to establish by a preponderance of the evidence that at the time Arnette signed the deeds of trust on the Subsequent Properties (wherein he made these promises) he never intended to (i) pay the property taxes on the Subsequent Properties when they came due, (ii) maintain insurance on the Subsequent Properties and name the Foundation as loss payee, and (iii) maintain the Subsequent Properties. On this record, the Court finds that the Foundation has failed in its proof.

**MEMORANDUM OPINION** **PAGE 20**

**d. Representation 11 Is Not Actionable Because the Misrepresentation Was Not Material**

In representation 11, Arnette represented to the Foundation that the proformas reflected the actual purchase price of each Subsequent Property.  It turns out, however, that only seven of the eight proformas listed the correct purchase price.  One of the eight proformas—the proforma for the Valley View Property—overstated the purchase price by $4,400.00, causing HomeQwest to receive "extra" funds at the closing of the purchase of that property.  *Compare* P-65 (proforma stating that purchase price was $42,000.00) with P-67 (settlement statement showing that purchase price was actually $37,600.00).  While representation 8 was therefore false with respect to the Valley View Property, it must also be material before it is actionable.

To be "material" the misrepresentation must have induced the Foundation to enter into a transaction that it would not have entered into had the representation not been made.  *See In re Westcap*, 230 F.3d at 726 (applying Texas law); *Reservoir Sys., Inc. v. TGS-NOPEC Geophysical Co., L.P.*, 335 S.W.3d 297, 305 (Tex. App. 2010); *Am. Med. Int'l v. Giurintano*, 821 S.W.2d 331, 338 (Tex. App. 1991).  The Court finds no credible evidence in the record that the Foundation would have refused to loan monies for the purchase and repair of the Valley View Property if it had known that Arnette overstated the purchase price of that property by $4,400.00.  The worst that would have happened, in all likelihood, is that the amount of the Foundation's loan would have been reduced by $4,400.00.

Because representation 11 proved to be accurate in connection with seven out of eight Subsequent Properties and not material to the eighth, it cannot be grounds for the Foundation's fraud claim.

#### e. Representation 12-15 Satisfy the Elements of a Fraud Claim; the Foundation was Defrauded

##### i. Element One: Material Misrepresentation

###### 1. Representations 12 and 13 Are Material Misrepresentations of Fact

As previously noted, for a representation of fact to be a misrepresentation it must be false. *See Trenholm*, 646 S.W.2d at 930. Prior to doing business with the Foundation, in an effort to gain the Foundation's trust, and ultimately its investment, Arnette represented to the Foundation that HomeQwest and Autopilot had previously completed over $10 million in residential real estate transactions. Arnette also said that his companies had purchased over forty properties in 2005, and that they were on track to acquire fifty-plus properties in 2006. Neither of these representations—12 and 13, respectively—was true. Moreover, according to Winslow's and Ward's undisputed testimony, the Foundation would not have done business with Arnette if they had known that Arnette had overstated his experience and expertise in the residential real estate business. Representations 12 and 13 are thus material misrepresentations.

###### 2. Representations 14 and 15 Are Promises of Future Performance

Representations 14 and 15 are promises of future performance that Arnette made to the Foundation on behalf of HomeQwest and Autopilot. In representation, 14 Arnette promised he would not take commissions or "sales loads" from the Foundation's funds. And in representation 15 he promised that the Foundation's funds would be used exclusively to purchase and repair particular Subsequent Properties.

As noted previously, Arnette's promises of future performance can be material misrepresentations for fraud purposes if he made them with the intent not to perform. *See supra*

at pp. 15-16.  The evidence presented at trial demonstrated that Arnette knew that he would not perform as promised when he made representations 14 and 15.  The evidence also established that the Foundation would not have invested with Arnette had it known he would not perform as promised.  Thus, representations 14 and 15 are material misrepresentations.

As noted previously, by April of 2007, when the loans involving the Subsequent Properties began to close, HomeQwest, Autopilot and Arnette were in extreme financial trouble. HomeQwest's financial statements showed significant continuing deterioration, P-237, and Arnette himself was exhausting his personal savings and taking monies out of HomeQwest to support his family that he would not be able to repay.  Despite these obvious problems, HomeQwest and/or Autopilot continued to borrow monies from the Foundation after having represented that the Foundation's funds would not be used to pay commissions or "sales loads" and that the Foundation's funds would be used to purchase and repair a particular Subsequent Property.

However, unlike representations 8, 9, and 10, when Arnette made representations 14 and 15, the evidence is clear that Arnette knew that he would use the Foundation's loan proceeds other than as he had represented.  He knew that because he had used other investor's funds on an unrestricted basis and he testified that he believed he was permitted to do so here.  In other words, according to Arnette, the documents did not preclude him from putting the Foundation's loan proceeds to uses other than to purchase and repair a particular Subsequent Property. Thomas' testimony and analysis revealed that Arnette used the Foundation's loan proceeds other than for the purchase and repair of particular Subsequent Properties in violation of representation 15.  Moreover, Arnette used Foundation funds to support himself and his family, thus effectively

taking the commissions or "sales load" he had promised would not be taken from the Foundation's funds in representation 14.

Arnette's fraudulent intent at the time representations 14 and 15 were made is revealed not only by HomeQwest's and Autopilot's failure to perform as promised, but also by the similar misuse of funds loaned by Kirtland, and the execution of documents to "fix" Kirtland's allegations of theft and misuse, including Arnette's execution of a personal guaranty in favor of Kirtland shortly before HomeQwest and Autopilot, acting through Arnette, began doing business with the Foundation.  According to the undisputed testimony of both Kirtland and Arnette, these documents were signed after Kirtland had threatened litigation against HomeQwest and Arnette.

In short, Arnette was in way over his head.  He knew he needed to bring in more investors to keep his companies and himself afloat.  To entice the Foundation into investing with him, Arnette continued to make certain promises that he never intended to keep; accordingly, these promises—representations 14 and 15—are misrepresentations that satisfy the first element of the Foundation's fraud claim.

### ii. Element Two:  Knowledge of the Falsity of the Representation

With respect to all of the representations that the Court has identified as satisfying the first element of the Foundation's fraud claim—namely, representations 12 through 15—the Court also concludes, based upon a careful review of the evidence, that Arnette, acting on behalf of HomeQwest and Autopilot, made those representations with knowledge of their falsity. Arnette knew (i) what amount of residential real estate transactions had actually been completed, (ii) that his companies had not purchased over forty properties in 2005 and were not "on track"

to acquire fifty-plus properties in 2006,[13] (iii) that he would take loan proceeds for his personal use, effectively taking a commission or "sales load" out of the loan proceeds, and (iv) that he would use loan proceeds for purposes other than the purchase and repair of the Subsequent Properties.  Accordingly, the second element of the Foundation's fraud claim has been proven.

### iii.   Elements Three and Four: Reliance

With respect to all of the representations that the Court has identified as satisfying the first two elements of the fraud claim—namely, representations 12 through 15—the Court concludes that Arnette, acting on behalf of HomeQwest and Autopilot, made those representations with the intent that the Foundation rely upon them, so as to induce the Foundation to invest funds with HomeQwest and/or Autopilot.  Specifically, in representations 12 and 13, Arnette sought to convince the Foundation of his companies' (and his) experience and expertise in buying, rehabilitating, and selling residential real property.  In representations 14 and 15, Arnette made promises regarding how the Foundation's funds would (and would not) be used.  Arnette intended that the Foundation rely on all of these representations when deciding to loan monies to HomeQwest and Autopilot to purchase and repair the Subsequent Properties.

To prove fraud, however, the Foundation must show that it actually and justifiably relied on Arnette's representations.  *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010).  Here, the uncontroverted evidence establishes that the Foundation actually relied upon representations 12 through 15.  Thus, the question becomes whether the Foundation's reliance was justifiable.

In measuring justifiability, Texas courts inquire whether, "given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the

---

[13] Arnette attempted to explain the "on track" to acquire fifty-plus properties in his trial testimony as a statement projecting what his companies could do over the next year.  That is simply incredible testimony.  The document is clear and unambiguous.  It refers to the current year – *i.e.*, 2006.

**MEMORANDUM OPINION**                                                                                          **PAGE 25**

time of the alleged fraud, it is extremely unlikely that there is actual reliance on the plaintiff's part." *Id.* (citing *Haralson v. E.F. Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir.1990) (applying Texas law)). The "justifiable reliance" element of common law fraud does not require a plaintiff to demonstrate reasonableness. *Lewis v. Bank of Am. NA*, 343 F.3d 540, 546 (5th Cir. 2003) (citing *Field v. Mans*, 516 U.S. 59, 70-71 (1995)). A fraud plaintiff "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Id.* But "it is only where, under the circumstances, the facts should be apparent to one of [the plaintiff's] knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Field*, 516 U.S. at 71-72 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed. 1971)); *see Holmes v. P.K. Pipe & Tubing, Inc.*, 856 S.W.2d 530, 542 (Tex. App. 1993) ("The duty of inquiry extends only to those matters that are fairly suggested by facts that are actually known").

As Arnette points out, the Foundation was a highly sophisticated party, with substantial investment expertise and the resources to conduct extensive due diligence before deciding to invest with him. And it is also true that even modest due diligence by the Foundation would likely have revealed the tenuous financial condition of Arnette and his companies. For example, if the Foundation had asked to see financial statements for its potential borrowers – *i.e.*, HomeQwest and Autopilot, the Foundation would have learned that Autopilot had no financial statements and that HomeQwest's financial condition was deteriorating rapidly. Or, if the Foundation had asked for the names of prior investors, like Kirtland, and had called them to see if they were satisfied with their dealings with Arnette, the Foundation might have learned that Kirtland had threatened to sue Arnette for theft and misuse of invested funds. Unfortunately, the

Foundation did neither; it simply took Arnette at face value because he dressed well, drove a nice car, was articulate, and, apparently, attended church in an affluent area of Dallas.

While Winslow and Ward may have been naïve here, the Court nonetheless finds that the Foundation was justified in its reliance.  Arnette cannot lie to his potential investors—as he did in representations 12 and 13, for example—and then, when the lies are discovered, cry foul because they should have known better than to trust him.   And, as noted previously, representations 14 and 15 involve Arnette's promises of future performance.  The likelihood that the Foundation would have learned that Arnette's promises of future performance were "patently false" from conducting a "cursory examination or investigation" is quite low.  The most obvious way the Foundation could have learned that Arnette believed he could use loan proceeds for non-purchase and repair purposes is if it had contacted Kirtland, but the evidence establishes that the Foundation was unaware of Arnette's dealings with Kirtland until after all of the loans had been advanced.  Moreover, even if the Foundation had asked for a list of Arnette's prior investors to call for due diligence purposes, it is highly unlikely that Arnette would have identified Kirtland, who accused Arnette of theft and misuse of invested funds just days before Arnette began his discussions with the Foundation about the Foundation's possible investment with him.  Finally, regardless of the Foundation's level of sophistication, there is no evidence that when any of the Subsequent Property transactions was funded the Foundation knew of facts, or "red flags," that would have triggered its duty to investigate the truth of Arnette's representations.  *Cf. Prime Income Mgmt., Inc., v. One Dallas Centre Assocs., LP*, No. 09-10349, 2009 WL 5102848, at *2-3 (5th Cir., Dec. 23, 2009) (a sophisticated party to a large commercial transaction and represented by counsel would likely be unjustified in not reading every word of a contract); *DeClaire v. G & B Mcintosh Family Ltd. P'ship*, 260 S.W.3d 34, 47 (Tex. App. 2008) ("reliance

upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law"). The Court therefore finds that the Foundation justifiably relied on representations 12 through 15.

Arnette next contends that the presence of merger clauses in two of the promissory notes for the Subsequent Properties serves to negate the reliance element of the Foundation's fraud claim. *See* P-44 and P-53. Arnette is correct that Texas courts have held that contracting parties may create contractual provisions that disclaim reliance, *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 61 (Tex. 2008), and that merger clauses, in particular, can negate the reliance element of a fraud claim. *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 571 (5th Cir. 2003). But to disclaim reliance the contract must do so by "clear and unequivocal language." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, No. 08–0989, 2011 WL 1445950, at *9 (Tex. April 15, 2011) (unpublished disposition) (finding that the contract language in question was not clear or unequivocal about disclaiming reliance and comparing that language to provisions previously held to be clear and unequivocal). "This elevated requirement of precise language helps ensure that parties to a contract—even sophisticated parties represented by able attorneys—understand that the contract's terms disclaim reliance, such that the contract may be binding even if it was induced by fraud." *Id*. *See also Forest Oil*, 268 S.W.3d at 61; *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179-80 (Tex. 1997).

Here, the merger clause contained in two of the eight promissory notes simply states that "[t]his written loan agreement represents the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements between the parties." As in the *Italian Cowboy* case, "a plain reading of the contract language at issue indicates that the parties' intent was merely to include the substance of a standard merger clause,

which does not disclaim reliance." *Id.* at *4. Accordingly, Arnette's argument fails; the Foundation justifiably relied on representations 12 through 15.

### iv. Element Five: Injury

The evidence at trial established that had the Foundation known that representations 12 through 15 were false, the Foundation would not have lent HomeQwest and Autopilot in excess of $1.7 million for the purchase and repair of the Subsequent Properties. Moreover, the evidence at trial established that the Foundation was injured as a result of its reliance upon these misrepresentations. The extent of the Foundation's damages will be discussed further below. *See* pp. 30-31, *infra*.

### f. Arnette's Failure to Disclose the Dispute with Kirtland was a Material Omission

In Texas, silence may be equivalent to a false representation when the circumstances impose a duty to speak on the party and he deliberately remains silent. *Myre v. Meletio*, 307 S.W.3d 839, 843 (Tex. App. 2010) (citing *Bradford*, 48 S.W.3d at 755). The elements of fraud by omission are: (1) the defendant concealed or failed to disclose a material fact within its knowledge to the plaintiff; (2) the defendant had a duty to disclose that fact; (3) the defendant knew the plaintiff was ignorant of the fact and the plaintiff did not have an equal opportunity to discover the truth; (4) the defendant intended to induce the plaintiff to take some action by concealing or failing to disclose the fact; (5) the plaintiff relied on the defendant's nondisclosure; and (6) the plaintiff was injured as a result of acting without that knowledge. *See Horizon Shipbuilding, Inc. v. BLyn II Holding, LLC*, 324 S.W.3d 840, 850 (Tex. App. 2010); *Bradford*, 48 S.W.3d at 754-55. In an arms-length transaction, a duty to disclose information arises (1) when one voluntarily discloses information, the whole truth must be disclosed; (2) when one makes a representation, new information must be disclosed when that new information makes the

earlier representation misleading or untrue; and (3) when one makes a partial disclosure and conveys a false impression. *Brown & Brown of Tex., Inc. v. Omni Metals, Inc.*, 317 S.W.3d 361, 384 (Tex. App. 2010).

For the reasons explained more fully below, the Court believes that these elements are satisfied here. First, it is undisputed that Arnette failed to disclose the dispute that arose with Kirtland just days before Arnette began discussions with the Foundation about its possible investment. Second, Arnette had a duty to disclose this information. Arnette bolstered his credibility and induced the Foundation to invest, in part, by telling the Foundation that he had other private investors. From the Court's perspective, this was a partial disclosure that conveyed a false impression. While it was true that Arnette had other private investors, the failure to disclose the fact that his largest private investor at that point—*i.e.*, Kirtland—was threatening to sue him for theft and misuse of invested funds is a problem. Third, Arnette knew that the Foundation was ignorant of the facts and that the Foundation did not have an equal opportunity to discover the facts. In fact, Arnette signed a personal guaranty of his companies' obligations to Kirtland in December 2006 to avoid a lawsuit being filed that would have become a public record. Fourth, by failing to disclose his falling out with Kirtland, Arnette intended to induce the Foundation to invest with him. Fifth, the Foundation relied on Arnette's nondisclosure. Both Winslow and Ward testified that the Foundation would not have loaned HomeQwest or Autopilot monies if they had known of Kirtland's allegations. Sixth, the Foundation was injured as a result of acting without that knowledge.

In conclusion, because each of the elements of a fraud claim—either an affirmative fraud claim or fraud by omission—has been proven by the Foundation, the Court concludes that the Foundation is entitled to a judgment against HomeQwest and Autopilot for "the actual amount of

the [Foundation's] loss that directly and proximately results from the defendant's fraudulent conduct." *Tilton v. Marshall*, 925 S.W.2d 672, 680 (Tex. 1996). Based upon the largely unrefuted testimony of Kinser, the Foundation's actual damages are $999,377.19, of which amount $48,901.89 is attributable to Autopilot and $950,475.30 is attributable to HomeQwest. *See* P-9.[14]

However, our analysis is not yet complete because the Foundation also seeks an award of exemplary damages in connection with its fraud claim. Section 41.003 of the Texas Civil Practice and Remedies Code allows a party to recover exemplary damages for injuries caused by, among other things, fraud. Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a) (West Supp. 2010). The determination of whether to award exemplary damages is within the Court's discretion as the trier of fact. *Id.* at § 41.010(b). Section 41.011(a) lists six factors the Court must consider: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; (5) the extent to which such conduct offends a public sense of justice and propriety; and (6) the net worth of the defendant. *Id.* at § 41.011(a). However, the Court must keep in mind that the "primary purpose of exemplary damages [is] to punish and deter." *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 666 (Tex. 2008). While there is no exact formula in setting the amount of exemplary damages, the amount awarded, if any, should be rationally related and reasonably proportioned to the actual damages. *Wright v. Gifford–Hill & Co., Inc.*, 725 S.W.2d 712, 714 (Tex. 1987).

---

[14] The aggregate amount of the Foundation's damages can be calculated by adding the amounts shown in columns 3-13, 15 and 16 minus the amounts shown in columns 18 and 20 of P-9. Autopilot dealt with the Foundation in connection with the Delaware Property. The damages attributable to the Delaware Property are specifically shown within each of these columns on P-9.

After carefully considering each of these factors, the Court concludes that no exemplary damages should be awarded to the Foundation here. This is so for primarily two reasons. First, given Arnette's relatively young age and the size of the judgment that the Court will ultimately determine to be nondischargeable in this bankruptcy case, *see infra* at pp. 45-50, the Court concludes that Arnette is being punished enough. This judgment is substantial and will burden Arnette for years to come. The Court expects this to deter future "bad acts" on his part. Exemplary damages would do little, if anything, more to further those ends.

Second, the Court remains troubled by the Foundation's lack of due diligence before deciding to invest substantial sums with Arnette. Neither Winslow nor Ward, who together possess decades of investing experience, conducted basic due diligence about Arnette and his companies. The Foundation did not even ask to see financial statements for its borrowers. Had Winslow or Ward asked for this very basic information, they would have learned that Autopilot had no separate books and records at all and that HomeQwest's liabilities exceeded its assets at the time of the Foundation's initial investment. It is hard to imagine that the Foundation would have proceeded with its investment if it had known the tenuous financial situation that existed. Of course, the Foundation had no legal obligation to conduct due diligence and thus it has prevailed on its fraud claim. However, given "the situation and sensibilities," the Court declines to exercise its discretion and award the Foundation exemplary damages.

### (2) The Breach of Contract Claim

In Texas, "[t]he essential elements of a breach of contact claim are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Aguiar v. Segal*, 167 S.W.3d 443, 450 (Tex. App. 2005).

Here, there is no question that we have valid contracts between HomeQwest and the Foundation and Autopilot and the Foundation – *i.e.*, the note and deed of trust signed in connection with each of the Subsequent Properties. Moreover, the Foundation fully performed; it loaned HomeQwest and Autopilot the monies that it agreed to loan. And there is no question that HomeQwest and Autopilot failed to pay the notes when due, failed to keep the Subsequent Properties insured as they agreed to do in the deeds of trust, failed to pay the taxes on the Subsequent Properties when due as they agreed to do in the deeds of trust, and failed to otherwise maintain the Subsequent Properties, thereby breaching their agreements with HomeQwest and Autopilot. Finally, the Foundation established that it was damaged by HomeQwest's and Autopilot's breaches. Accordingly, the Foundation is entitled to recover its benefit-of-the-bargain damages, which are designed to restore the Foundation to the economic position it would have been in had the contract been performed. *Brown v. Ogbolu*, 331 S.W.3d 530, 535 (Tex. App. 2011). Based upon Kinser's testimony, the Court concludes that the Foundation is entitled to recover its actual damages in the aggregate amount of $853,480.59.[15] HomeQwest is liable for $821,106.57 of this amount and Autopilot is liable for $32,374.02 of this amount.

_____

[15]This amount is calculated as follows: $1,743,400.00 for the original loan amount (P-9, column 3) + $282,652.28 in interest through 2/1/09 (*Id.*, column 4) + $5,455.58 for 2006 taxes (*Id.*, column 5) + $54,757.34 for 2007 taxes (*Id.*, column 6) + $33,723.18 for 2008 taxes (*Id.*, column 7) + $2,556.39 for 2009 taxes (1/12 of total year's taxes because deeds in lieu accepted on 2/2/09; *Id.*, column 8) + $0 in 2010 Taxes (because the Foundation owned the properties at that point, after taking the deeds in lieu; *Id.*, column 9) + $10,710.18 in Labor Liens (*Id.*, column 10) + $1,200 in Other Mortgage Deeds (which is an amount that the Foundation needed to pay in order to release lien held by 3rd party on Delaware Property; *Id.*, column 11) + $6,000 in "Other Down Payment" (which is the amount that the Foundation needed to return to a tenant who had paid Arnette $6,000 as a down payment on the purchase of the Keystone Property; *Id.*, column 11) + $0 in closing costs (*Id.*, column 13; these costs were incurred after the Foundation became the owner of the properties) + $882.64 for 34 days' insurance coverage on the properties (from 12/31/08-2/2/09) - $1,287,857 (agreed credit pursuant to the deeds in lieu of foreclosure) = $853,480.59.

Moreover, in an action for breach of contract, the prevailing party is entitled to recover its reasonable attorneys' fees pursuant to either the terms of its contract or Texas Civil Practice & Remedies Code section 38.001. Here, the Foundation retained the law firm of Bell Nunnally & Martin LLP to represent it in connection with its state court suit and the Adversary. As the prevailing party on its breach of contract claim, the Foundation is entitled to recover its reasonable attorneys' fees and expenses from HomeQwest and Autopilot pursuant to the terms of the notes and pursuant to section 38.001.

At the outset of trial, the parties announced an agreement to liquidate the amount of their attorneys' fees following the issuance of the Court's liability ruling. Thus, the Court will liquidate the amount of the Foundation's reasonable attorneys' fees at a subsequent hearing in accordance with the parties' agreement and Federal Rule of Civil Procedure 54(d)(2).

### (3) The Suit on a Note Claim

In the alternative to its breach of contract claim,[16] the Foundation sought to recover from HomeQwest and Autopilot on a "suit on a note" claim. Although the Court has concluded that the Foundation has proven its breach of contract claim, in the event this Court's decision on the breach of contract claim is in error, the Court will proceed to consider the Foundation's suit on a note claim.

According to Texas law, the Foundation must prove the following elements to recover on a cause of action for suit on a note: (1) it is the owner and holder of the notes executed in connection with the loans for the purchase and repair of the Subsequent Properties; (2)

---

[16] The Foundation also asserted three equitable claims against Arnette, HomeQwest, and Autopilot in the alternative to its breach of contract claim: (1) unjust enrichment, (2) money had and received, and (3) promissory estoppel. Because the Court has concluded that the Foundation has proven both its breach of contract claim and its suit on a note claim, it is not necessary to consider the Foundation's equitable claims further. Moreover, any damages awarded on the equitable claims would be dischargeable in Arnette's bankruptcy case, making a determination of the amount of the damages resulting from such claims of no consequence here. For these reasons, the Court will not decide the Foundation's equitable claims.

**MEMORANDUM OPINION**                                                                 **PAGE 34**

HomeQwest and Autopilot executed the Notes; and (3) an amount remains outstanding on the notes. *Austin v. Countywide Homes*, 261 S.W.3d 68, 72 (Tex. App. 2008).

Based upon the evidence, the Foundation has proven its suit on a note claim. The Foundation established that it is the owner of the notes executed in connection with the purchase of the Subsequent Properties. Arnette, as President of HomeQwest and the sole member of Autopilot, executed the notes, and amounts remain outstanding on the notes.

The measure of damages in a suit on a note is the unpaid principal balance of the note, together with interest and attorneys' fees if provided for in the note. *U.S. v. Elliott*, 3:06-CV-1625-G, 2006 WL 3759857, at *3 (N.D. Tex. Dec. 19, 2006). Here, the notes provide for both interest and attorneys' fees. The only payments made on the notes were the agreed credits set forth in the deeds in lieu of foreclosure. The outstanding balance of the notes, with interest through February 1, 2009 (the date the Foundation's affiliate accepted title to the Subsequent Properties by deeds in lieu of foreclosure), was $738,395.28,[17] of which amount Autopilot is liable for $23,182.43and HomeQwest is liable for $715,212.85. Moreover, the Foundation is entitled to recover its reasonable attorneys' fees pursuant to the terms of the notes, which amount will be liquidated at a subsequent hearing.

## B. Can Arnette be held Personally Liabile?

### (1) Piercing the Corporate and Limited Liability Shield

There are "three broad categories in which a court may pierce the corporate veil:[18] (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for

---

[17] This amount is calculated as follows: $1,743,400 (the outstanding principal amount of the notes; *see* P-9 column 3) plus $282,852.28 (interest through 2/1/09 on the notes; *Id.*, column 4) minus $1,287,857 (agreed credit per deeds in lieu of foreclosure; *Id.*, side calculation).

[18] Texas has applied the principles used to pierce the corporate veil to pierce the liability shield of limited liability companies. *See Sanchez v. Mulvaney,* 274 S.W.3d 708, 712 (Tex. App. 2008).

illegal purposes; and (3) the corporation is used [as a sham] to perpetrate a fraud." *Rimade Ltd. v. Hubbard Enterprises, Inc.*, 388 F.3d 138, 143 (5th Cir. 2004) (citing *W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994)). The Foundation argues that the Court should disregard HomeQwest's and Autopilot's corporate and limited liability shields under the alter ego and sham theories. But before the Court analyzes those theories, it will consider whether the Foundation must satisfy section 21.223 of the Texas Business Organizations Code, which "sets forth additional requirements for piercing the corporate veil in cases based on claims for *breach of contract*." *Rimade*, 388 F.3d at 143 (emphasis added).

### a. Section 21.223 of the Texas Business Organizations Code

The Foundation contends that section 21.223 does not apply to its veil piercing claims because they sound in tort, not contract. The Court's research reveals some inconsistency among the decisions dealing with the scope of section 21.223 and its predecessor statute. Some courts have found that "[g]iven its broad scope, [section] 21.223 applies to both contractual claims and ancillary torts," including fraud. *In re Antone's Records, Inc.*, 08–12292–CAG (Adv. No 09–01010), 2011 WL 309146, at *24 (Bankr. W.D. Tex. Jan. 25, 2011) (collecting state and federal court cases so stating). Other courts, however, have said that courts should not "be too liberal in determining that a cause of action 'relates to or arises from a corporation's contractual obligation.' To define fraud [and] fraudulent inducement … claims as 'matters relating to or arising from a corporation's contractual obligation,' and thus require plaintiffs to meet [section 21.223]'s requirements in order to hold the individual tortfeasor liable extends the statute beyond its intended and logical reach." *Kingston v. Helm*, 82 S.W.3d 755, 766 (Tex. App. 2002).

In *Kingston*, the court found that the statute "seeks to protect shareholders—*i.e.*, persons having some kind of ownership interest in the corporation—from being held personally liable for

corporate obligations." *Id*. The *Kingston* court believed "that identifying shareholders or owners as the only class of persons protected by the statute indicates that the kind of liability it protects them from is liability that would exist by virtue of the mere status as an owner of or shareholder in the corporation." But the court did "not believe that this article was intended to shield a corporate officer or agent who commits tortious conduct merely because the officer or agent also possesses an ownership interest in the corporation." *Id.*; *but see Texas-Ohio Gas, Inc. v. Mecom*, 28 S.W.3d 129, 133-34 (Tex. App. 2000) (holding that suit against vice-president and manager of corporation for fraud, fraudulent inducement, negligent misrepresentation, and tortious interference with a contract was subject to requirements of section 21.223, which provides the "exclusive means for recovery against shareholders of a corporation for such claims" because such claims "attempt[] to hold shareholders personally liable for a 'matter relating to or arising from' a contractual obligation of the corporation").

While the disagreement over the precise scope of section 21.223 is interesting, this Court need not resolve it here because, even assuming section 21.223 applies, the Foundation has satisfied the statute's requirements. Under section 21.223, merely proving alter ego or sham to perpetrate a fraud "is not enough; in order to pierce the corporate veil, the [Foundation] must also demonstrate fraud by and direct personal benefit to the obligor." *Thrift v. Estate of Hubbard*, 44 F.3d 348, 353 (5th Cir. 1995); *see* Tex. Bus. Orgs. Code Ann. § 21.223 (West 2010) (the veil may be pierced where the defendant shareholder "caused the corporation to be used for purposes of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder"). "Where actual fraud primarily for the benefit of the perpetrating shareholder or shareholders can be shown, the various doctrines for disregarding the

corporate entity, including alter ego and a sham to perpetrate a fraud, are still very much alive." *Farr v. Sun World Sav. Ass'n*, 810 S.W.2d 294, 296 (Tex. App. 1991).

### i. Actual Fraud

In the context of piercing the corporate veil, the concept of "actual fraud" contained in section 21.223 is not the same as the common law tort of fraud discussed above. *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App. 2010). The plaintiff need not prove each element of common law fraud; rather, actual fraud under section 21.223 simply requires proof of "dishonesty of purpose or intent to deceive." *Id.* at 607; *see also Dick's Last Resort of W. End, Inc. v. Market/Ross, Ltd.,* 273 S.W.3d 905, 908 (Tex. App 2008) (rejecting the argument that an actual fraud jury instruction should include elements of the tort of common law fraud because it was enough for the instruction to provide that "actual fraud means actions involving dishonesty of purpose or intent to deceive"); *Castleberry v. Branscum*, 721 S.W.2d 270, 273 (Tex. 1986), *superceded by statute as recognized in W. Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 68 (5th Cir. 1994); *Priddy v. Rawson*, 282 S.W.3d 588, 600 (Tex. App. 2009); *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 387 (Tex. App. 2007).

Here, the Court concludes that the Foundation has proven actual fraud for the purposes of section 21.223. HomeQwest and Autopilot, acting through Arnette, made material misrepresentations to the Foundation from the outset. Arnette overstated his prior successes (through HomeQwest and Autopilot) in order to induce the Foundation to invest with them. And by the time HomeQwest and Autopilot, acting through Arnette, began dealing with the Foundation, Arnette knew (or should have known), at a minimum, that the investors believed that the proformas he prepared included at least an implicit promise to use their loan proceeds

solely for the purchase and repair of the targeted property.  Otherwise, the "deal" proposed by HomeQwest and Autopilot could not work as represented.  In other words, without the repair funds actually being spent on repairs, the 70-75% loan-to-value ratio represented by them to their investors could not be achieved.  In fact, this misuse of repair funds was at least one of the reasons for Kirtland's threatened lawsuit.

Notwithstanding Kirtland's allegations of theft and misuse of funds being made immediately prior to the commencement of his business dealings with the Foundation, Arnette did nothing to clarify this issue with his next investor, the Foundation.  In other words, Arnette continued to use the same types of documents and failed to disclose to the Foundation that he believed that he could use its loan proceeds for purposes other than the repair of the properties on which the Foundation would have a lien.  Of course, had Arnette so stated—through clarifying the documents or otherwise—the entire premise of the "safe investment" would have crumbled, as the touted loan-to-value ratio that made the investment "safe" would no longer exist.  *See* P-1 at p. WFF 00591 (Arnette's explanation of why the investment was safe).

It is clear from the evidence that HomeQwest and Autopilot, acting through Arnette, never intended to comply with the terms of the agreement that were so critical to the Foundation's decision to invest with them.  When the Foundation demanded explanations from Arnette regarding the disposition of hundreds of thousands of dollars of the Foundation's money, Arnette continued his fraudulent ways by lying about the status of the repairs to the properties, the outstanding tax obligations against the properties, and the status of insurance on the properties.  Sadly, based upon the credible trial evidence, there is no doubt that Arnette was dishonest in his dealings with the Foundation and intended to mislead the Foundation from the outset.

### ii.  Primarily for Arnette's Personal Benefit

The evidence also showed that HomeQwest and Autopilot perpetrated the actual fraud primarily for Arnette's direct personal benefit.  Tex. Bus. Orgs. Code Ann. § 21.223(b) (West 2010).  After reviewing the evidence in light of the considerable case law on this issue, the Court concludes that the fraud here did primarily serve to directly benefit Arnette.  A brief discussion of some of those cases will be instructive.

In *In re Morrison*, 361 B.R. 107, 120 (Bankr. W.D. Tex. 2007), the court concluded that Morrison, the president and majority stockholder of an excavation company, received a direct personal benefit from misrepresenting the corporation's financial health to obtain a lucrative contract.  The court noted that Morrision "alone ran the company and made all the decisions regarding its operation."  *Id.*  He also "knew of the dire financial condition of his company," and that he "needed this contract to keep the doors open … in order to draw his large salary and maintain his lifestyle."  *Id.*

In *Farr*, 810 S.W.2d at 294, the court upheld a finding of direct personal benefit against a shareholder who, while "handl[ing] the company financial affairs as he saw fit," used the proceeds from the sale of a note to pay personal stock purchase loans, rather than tendering the proceeds to the lender as agreed.  In *JNS Aviation, Inc. v. Nick Corp.*, 418 B.R. 898, 908 (N.D. Tex. 2009), a creditor obtained a default judgment against an aviation company.  The owners of the company, in an effort to avoid satisfying the judgment, transferred company assets to a newly formed entity.  In analyzing the defendant's personal liability, the district court affirmed the bankruptcy court's findings of actual fraud and direct personal benefit.  The district court agreed with the bankruptcy court that "the purpose of the transfers … was to continue the business operations unencumbered by the Default judgment."  *Id.* at 908 (quoting *In re JNS Aviation,*

*LLC*, 376 B.R. 500, 531 (Bankr. N.D. Tex. 2007)).  Moreover, because the owners of the company were the sole owners "they had to be acting in their own best interests.  They were not looking to protect an entity or any other shareholders.  No other shareholders (members) existed.  They had no other interest to serve."  *Id.*  Thus, the owners "were seeking to continue the operations for their own personal benefit."  *Id.*; s*ee also Country Village Homes, Inc. v. Patterson*, 236 S.W.3d 413, 436 (Tex. App. 2007) (companies' sole shareholder, director, and president received direct personal benefit by paying for personal items out of companies' accounts; thus "a fraud for the benefit of [the companies] would likewise benefit [the sole shareholder]); *Thrift*, 44 F.3d at 354-55 (direct personal benefit shown by evidence that funds a company should have used to repay creditor were instead used, among other things, to make payments on the lease for company's offices, which lease was held in company owner's name).

Here, there is no doubt that Arnette used HomeQwest and Autopilot to perpetrate a fraud that primarily served to directly benefit him.  As in the cases cited above, HomeQwest and Autopilot were wholly owned and controlled by Arnette.  He was the only one who stood to benefit from the companies' continued operations.  And he knew that if his companies failed, he would lose his livelihood.  Obtaining the Foundation's investments was therefore critically important to Arnette personally, and he directly benefitted from that investment.  Moreover, Arnette used Foundation loan proceeds to make distributions and advances to himself, thereby enabling him to continue to support his family and lifestyle.  Had Arnette not defrauded the Foundation into investing with his companies, he would not have received the benefit of the Foundation's funds for these advances and distributions.

### b. Sham to Perpetrate a Fraud

The "sham to perpetuate injustice" or "sham to perpetrate a fraud" theory has been recognized in Texas as a distinct method by which to pierce the corporate veil. *See Castleberry*, 721 S.W.2d at 273. Under Texas law, the sham theory "is an equitable doctrine, and Texas courts take a 'flexible fact-specific approach focusing on equity.' The Texas Supreme Court has also noted that the variety of shams is infinite, and that the purpose of the doctrine should not be thwarted by adherence to any particular theory of liability." *Permian Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643–44 (5th Cir. 1991) (internal citations and quotations omitted). The focus of the analysis under this theory "is on some inequitable result for the claimant, because of abuses of the corporate form." *Gibraltar Sav. v. LDBrinkman Corp.,* 860 F.2d 1275, 1289 (5th Cir. 1988). The question of injustice or inequity is a question of fact. *Id.*

After reviewing Texas case law, the Court does not find that the sham to perpetrate a fraud theory applies in this case. In general, the theory most frequently applies "where the corporate fiction is resorted to as a means of evading an existing legal obligation." *Id.* For example, in *Castleberry*, the court found a sham to perpetrate a fraud when two shareholders created a new corporation and transferred all of the assets of the original corporation to it to avoid the original corporation's obligation to pay the third shareholder for the buy-back of his shares. 721 S.W.2d at 274-75; *see also JNS*, 418 B.R. at 907-08 (owners transferred company assets to a newly formed entity intending to leave liabilities behind in a "worthless shell"). Neither HomeQwest nor Autopilot were "resorted to as a means of evading an existing legal obligation." Both companies existed before the Foundation invested with Arnette. Moreover, Arnette did not transfer assets among his companies with the purpose of using the corporate form

to shield those assets from creditors. The Court thus finds the sham to perpetrate a fraud theory inapplicable here.

### c. Alter Ego

Texas courts recognize the alter ego doctrine as another theory to pierce the corporate veil. *Sparks v. Booth*, 232 S.W.3d 853, 868 (Tex. App. 2007) (citing *Castleberry*, 721 S.W.2d at 272). Under this theory, liability follows if there exists such unity between the corporation and the individual that the corporation ceases to be separate, and holding only the corporation liable would promote injustice. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 226, 288 (Tex.1990) (citing *Castleberry*, 721 S.W.2d at 272). As proof of alter ego, a court may consider: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failure to keep corporate and personal assets separate. *See Mancorp*, 802 S.W.2d at 228; *Morris v. Powell*, 150 S.W.3d 212, 220 (Tex. App. 2004), *overruled on other grounds Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 788–89 (Tex. 2005). However, the failure of a corporation to observe any corporate formality is no longer a factor in considering whether alter ego exists. *See* Tex. Bus. Orgs. Code Ann. § 21.223(a)(3) (West 2010). In sum, the plaintiff must prove it is necessary to hold the individual liable, as opposed to the corporate form, in order to avoid a substantial injustice to the plaintiff. *Mancorp,* 802 S.W.2d at 228.

Based upon the facts found on pages 11-12 above, the evidence supports a finding of alter ego. Moreover, the Foundation has proven that Arnette, acting through HomeQwest and Autopilot, defrauded the Foundation; yet, HomeQwest and Autopilot are out of business and have no assets to satisfy a judgment in the Foundation's favor. *See Stewart & Stevenson Servs.,*

*Inc. v. Serv–Tech Inc.*, 879 S.W.2d 89, 110 (Tex. App. 1994) (In a tort case "the financial strength or weakness of the corporate tortfeasor is an important consideration" in the alter ego analysis).  For these reasons, the Court concludes that Arnette should be held personally liable for the debts of both HomeQwest and Autopilot under the alter ego theory.

### (2) An Agent is Liable for His Own Fraudulent and Tortious Acts

There is another way the Foundation can hold Arnette personally liable for its damages. Under Texas common law, "a corporation's agent is personally liable for his own fraudulent or tortuous acts, even when acting within the course and scope of his employment."  *Sanchez v. Mulvaney*, 274 S.W.3d 708, 712 (Tex. App. 2008); *see Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002); *Cimarron Hydrocarbons Corp. v. Carpenter*, 143 S.W.3d 560, 564 (Tex. App. 2004); *Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App. 2003) ("The law is well-settled that a corporate agent can be held individually liable for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a representative of the corporation" (citation omitted)).  "In an action seeking to hold an agent individually liable for his tortuous or fraudulent acts, the corporate veil is not required to be pierced."  *Sanchez*, 274 S.W.3d at 712; *Gore*, 132 S.W.3d at 32; *Kingston*, 82 S.W.3d at 761.

Accordingly, Arnette, as an agent of HomeQwest and Autopilot, is personally liable for the damages caused by the misrepresentations he made to the Foundation in connection with HomeQwest's and Autopilot's business dealings with the Foundation.  As noted previously, the amount of those damages is $999,377.19.  *See supra* at p. 31.

Given that the Court has concluded that (i) the Foundation is entitled to a judgment against HomeQwest and Autopilot under multiple legal theories, and (ii) Arnette should be held

personally liable for that judgment under multiple legal theories, the Court will next address the dischargeability/discharge issues raised by the Foundation.

### C.  The Section 523 and 727 Claims

As a predicate legal matter, the Court notes that exceptions to discharge should be construed in favor of the debtor.  *Fezler v. Davis (In re Davis)*, 194 F.3d 570, 573 (5th Cir. 1999).  The creditor bears the burden of proving by a preponderance of the evidence that a debt should not be discharged under section 523(a).  *See Grogan v. Garner*, 498 U.S. 279, 291 (1991); *In re Acosta*, 406 F.3d 367, 372 (5th Cir. 2005).

#### a.  Section 523(a)(2)(A)

Section 523(a)(2) provides that "a discharge under section 727 … does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by:  (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition …."  11 U.S.C. § 523(a)(2)(A).  Although the general purpose of the Bankruptcy Code is to provide debtors with a fresh start, "section 523(a)(2)(A) is not designed to protect debtors; rather it is designed to protect the victims of fraud."  *In re Quinlivan*, 434 F.3d 314, 319 (5th Cir. 2005).  "Despite the more general purpose of the bankruptcy code, which is to give debtors a fresh start, section 523(a)(2)(A) captures a competing principle."  *Id.*  Congress intended section 523(a)(2)(A) to protect victims of fraud over the defrauding debtor.  *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).

The Foundation has alleged that Arnette committed both actual fraud and made false pretenses and representations to the Foundation to induce it to lend monies to HomeQwest and Autopilot.  For the reasons stated above, the Court has concluded that the Foundation has proven

**MEMORANDUM OPINION**                                                                                    **PAGE 45**

its state law fraud claim against HomeQwest and Autopilot, and that Arnette is personally liable to the Foundation for that fraud. Based largely upon those findings and conclusions, and for the reasons explained more fully below, the Court also concludes that this fraud judgment, in the amount of $999,377.19, is not dischargeable in accordance with section 523(a)(2)(A) of the Bankruptcy Code.

The Fifth Circuit has stated, without distinguishing between the different torts encompassed by section 523(a)(2)(A), that for a debt to be non-dischargeable under that section, the creditor must show that (1) the debtor made a representation; (2) the debtor knew the representation was false; (3) the debtor made the representation with the intention to deceive the creditor; (4) that the creditor actually and justifiably relied on such representations; and (5) that the creditor sustained losses as a proximate result of its reliance. *In re Acosta*, 406 F.3d at 372; *RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir. 1995); *McCoun v. Rea (In re Rea)*, 245 B.R. 77, 85 (Bankr. N.D. Tex. 2000).

False representations need not be overt. "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation." *AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 404 (5th Cir. 2001). Furthermore, "intent to deceive may be inferred from a reckless disregard for the truth or the falsity of a statement combined with the sheer magnitude of the resulting misrepresentation." *In re Acosta*, 406 F.3d at 372 (quoting *In re Norris*, 70 F.3d 27, 30 (5th Cir. 1995)). "Intent of a kind sufficient to preclude discharge for debt for money obtained by debtor's false pretenses, false representation or actual fraud may be inferred where the debtor makes a false representation and knows or should know that the statement will induce another to act." *In re Hurst*, 337 B.R. 125, 133 (Bankr. N.D. Tex. 2005). When examining a debtor's intent under section 523(a)(2)(A), the

Court is required to consider whether the circumstances in the aggregate present a picture of deceptive conduct on the part of the debtor, which betrays an intent on the part of the debtor to deceive his creditors. *Id*. Where the debtor intends or has reason to expect a creditor to act in reliance upon the debtor's representations, there is an intent to deceive on the part of the debtor. *Id*.

Here, as noted previously, the Foundation has established the elements of fraud. HomeQwest and/or Autopilot, acting through Arnette, made numerous material representations in its business dealings with the Foundation, thereby inducing the Foundation to loan them in excess of $1.7 million. HomeQwest and Autopilot, acting through Arnette, knew those representations were false when they were made and/or had no intention of performing them at the time they were made. HomeQwest and Autopilot, acting through Arnette, intended for the Foundation to rely on those representations. The Foundation actually relied, and was justified in relying, upon those representations. The Foundation sustained a loss as a proximate result of its reliance. And, as the Court concluded previously, Arnette is personally liable for this fraud. Accordingly, all of the elements of section 523(a)(2)(A) are satisfied.

The testimony at trial clearly established that the Foundation was damaged in the amount of $999,377.19 as a result of Arnette's fraud, which debt is non-dischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

### b. Section 523(a)(4)

"A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). "Unlike debts arising out of fraud or defalcation [under § 523(a)(4)], those arising out of embezzlement or larceny need not involve a fiduciary." *Tolson*

*v. Wood (In re Wood)*, No. 03–81965 (Adv. No. 04–3191) 2007 WL 2154239, at *24 (Bankr.

N.D. Tex. July 25, 2007) (quoting *In re Adams*, 348 B.R. 368, 373 (Bankr. E.D. La. 2005)).

As noted previously, here the Foundation relies upon Arnette's alleged embezzlement of

its loan proceeds to support its claim. Embezzlement is defined for purposes of section 523(a)(4)

as the "fraudulent appropriation of property by a person to whom such property has been

entrusted, or into whose hands it has lawfully come." *In re Miller*, 156 F.3d 598, 602 (5th Cir.

1998).

The Foundation presented both direct and circumstantial evidence to support a finding

that HomeQwest and Autopilot, acting through Arnette, their alter ego, embezzled at least

$216,513.09 of the Foundation's loan proceeds.[19] It is clear that these loan proceeds were to be

used solely for the repair of the Subsequent Properties and that they were not used for that

purpose. The Court finds that the circumstances surrounding the misappropriation indicates

fraud and, after carefully considering all of the evidence, this Court finds that HomeQwest and

Autopilot, acting through Arnette, their alter ego, intended to defraud the Foundation when the

loan proceeds were received.

Each of the elements of embezzlement are met, and the amount of $216,513.09 is

nondischargeable under section 523(a)(4).

### c. Section 523(a)(6)

Section 523(a)(6) of the Bankruptcy Code provides that:

> (a) A discharge under Section 727 . . . of this title does not discharge an
> individual debtor from any debt . . .
> (6) for willful and malicious injury by the debtor to another entity or to the
> property of another entity.

---

[19] The Foundation also asks this Court to conclude that HomeQwest and Autopilot, acting through Arnette, their
alter ego, embezzled $18,519.00 of prorated taxes that were not paid to the taxing authorities when the taxes came
due. However, those funds did not belong to the Foundation and thus could not have been embezzled by Arnette
from it.

**MEMORANDUM OPINION**                                                                 **PAGE 48**

The United States Supreme Court has reexamined in recent years whether the scope of section 523(a)(6) encompasses all intentional acts that cause injury, or only acts done with an actual intent to cause injury.  *In Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the Supreme Court held that, in order for liability under section 523(a)(6) to attach, an actor must inflict a deliberate or intentional injury, not merely take a deliberate or intentional act that leads to injury.  The Fifth Circuit, in an effort to distinguish between acts intended to cause injury as opposed to those merely leading to injury, determined that an injury is "willful and malicious" where there is either: (1) an objective substantial certainty of harm arising from a deliberate or intentional action or (2) a subjective motive to cause harm by a party taking a deliberate or intentional action.  *Miller*, 156 F.3d at 604-06.  "Injuries covered by section 523(a)(6) are not limited to physical damage or destruction; harm to personal or property rights is also covered by section 523(a)(6).  Willful conversion of another's property falls within section 523(a)(6)." *In re Beveridge*, 416 B.R. 552, 571 (Bankr. N.D. Tex. 2009).

HomeQwest and Autopilot, through their alter ego Arnette, acted deliberately and intentionally to divert the Foundation's loan proceeds for purposes other than that for which they were advanced.  Moreover, the evidence clearly supports a finding that Arnette's multiple acts of misuse of the Foundation's loan proceeds were objectively and substantially certain to cause harm to the Foundation.  As found previously, the entire predicate of Arnette's "safe investment" opportunity was that the loans would have a loan-to-after-repaired-value ratio of 70-75%.  Without the monies advanced for the repairs actually being used for that purpose, the entire predicate of the investment was undermined.  HomeQwest and Autopilot, acting through their alter ego Arnette, knew this.  Arnette also knew, at the time he was soliciting the Foundation's investment, that he would use the loan proceeds for non-repair purposes.  He knew this because

**MEMORANDUM OPINION**                                                                 **PAGE 49**

(i) he had been using prior investor's loan proceeds for non-repair purposes, (ii) his companies were insolvent and he needed to use new loan proceeds to try to keep prior deals afloat, and (iii) he needed monies to support his family and his personal savings were substantially depleted. Had the Foundation understood Arnette's real intent, they would not have invested with him.

Each of the elements of section 523(a)(6) are met, and the debt in the amount of $999,377.19 is nondischargeable under section 523(a)(6).

### d.  Section 727(a)(5)

Section 727(a)(5) provides for the denial of a discharge if the debtor fails to satisfactorily explain any loss of assets or deficiency of assets to meet the debtor's liabilities.  11 U.S.C. § 727(a)(5).  The objecting party has the burden of proving the objection initially, but once the objecting party has produced evidence establishing a basis for the objection, the burden shifts to the debtor to explain the loss satisfactorily.  *In re Reed*, 700 F.2d 986, 992-93 (5th Cir. 1983). Vague and indefinite explanations uncorroborated by documentation are unsatisfactory.  *Id*.

The Foundation's theory of this claim changed at trial.  In its Proposed Findings and Conclusions, the Foundation asks this Court to find that "Arnette misappropriated at least $235,082.00 of the Foundation's Funds.  However, other than to provide an Excel spreadsheet of HomeQwest's heavily altered/manipulated Quickbooks and copies of seriously redacted bank statements, Arnette cannot account for the disposition of these Funds."  Plaintiff's Findings and Conclusions at ¶ 58.  The Foundation then asks the Court to conclude that "Arnette failed to satisfactorily explain the loss of the hundreds of thousands of dollars he misappropriated from HomeQwest's bank account; therefore, Arnette has failed to satisfactorily explain the loss of the assets or deficiency of assets to meet his liabilities."  *Id*. at ¶ 59.

During closing arguments, however, the Foundation's theory changed. It changed because both Arnette and the Foundation's own expert witness, Thomas, explained where the $235,082 went—*i.e.*, it got spent on "other HomeQwest properties, operating expenses or personal expenses of Arnette." P-153 at p. 3. During his closing argument, counsel for the Foundation argued—for the first time—that Arnette had failed to explain the loss of assets of *HomeQwest* from December 31, 2008 (as reflected on its balance sheet) to December 22, 2009, the date of Arnette's personal bankruptcy filing. According to the Foundation's counsel, Arnette should have known to address this issue in his evidence (although it had never been articulated before by the Foundation) because of the Foundation's alter ego claim.

Arnette's counsel argued unfair surprise, and that he would have had Arnette explain where HomeQwest's assets went in that one-year period if he had known that he needed to do so.[20]

The Court agrees with Arnette's counsel. He was unfairly surprised by this new theory for the denial of Arnette's discharge. Even the Court was surprised by the Foundation's new argument. The remedy of a complete denial of a debtor's discharge is the bankruptcy equivalent of the death penalty in criminal law. The debtor should be given fair notice of that which he is expected to explain in order for his failure to do so to be accorded that stiff penalty.

For these reasons, the Court concludes that the Foundation is not entitled to cause Arnette to lose his discharge generally.

---

[20] The Court believes this to be true and believes further that substantially all of the required explanation is readily apparent from the face of the Foundation's own exhibits. As noted previously, based upon its December 31, 2007 balance sheet, HomeQwest's liabilities exceeded its assets by about $500,000.00. P- 237. At year end 2008, based upon its December 31, 2008 balance sheet, HomeQwest's negative equity had grown to $631,877.08. *Id.* Moreover, the December 31, 2008 balance sheet itself shows that substantially all of the assets for which the Foundation believes an explanation from Arnette was due were encumbered by liens (and liabilities) that either substantially equaled or exceeded the asset's book value. *Id.* Of course, we know where the Subsequent Properties (which were reflected on the December 31, 2008 balance sheet) went – *i.e.*, back to the Foundation through the execution of the deeds in lieu of foreclosure on February 2, 2009. P-111–P-118.

### III.    CONCLUSION

The Foundation has proven the following claims against HomeQwest and Autopilot: (i) fraud, with actual damages of $950,475.30 against HomeQwest and $48,901.89 against Autopilot; (ii) breach of contract, with actual damages of $821,106.57 against HomeQwest and $32,374.02 against Autopilot; and (iii) in the alternative, suit on a note, with actual damages of $715,212.85 against HomeQwest and $23,182.43 against Autopilot.

The Foundation has also proven that Arnette is personally liable for these debts under several theories – *i.e.*, (i) section 21.223 of the Texas Business Organizations Code, (ii) alter ego, and/or (iii) as an agent of HomeQwest and Autopilot.

Moreover, the Foundation has proven that a judgment against Arnette in the amount of $999,377.19 is nondischargeable in accordance with sections 523(a)(2)(A) and (a)(6) of the Bankruptcy Code and that $216,513.09 of that judgment is also nondischargeable in accordance with section 523(a)(4) of the Bankruptcy Code.  However, the Foundation failed to prove that Arnette's discharge should be denied in accordance with section 727(a)(5) of the Bankruptcy Code.

A separate Judgment consistent with this Memorandum Opinion will be entered by the Court following the hearing on attorneys' fees.

### ### End of Memorandum Opinion ###